**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3822-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KESHAUN D. EARLEY, a/k/a
KESHAWN EARLEY,
KESHAWN EARLY, and
BUDDHA EARLEY,

    Defendant-Appellant.

_____

Argued March 11, 2025 – Decided September 5, 2025

Before Judges Gooden Brown and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 13-03-0858.

Lauren S. Michaels, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Lauren S. Michaels, of counsel and on the briefs).

Kristen Nicole Pulkstenis, Assistant Prosecutor, argued the cause for respondent (William E. Reynolds, Atlantic County Prosecutor, attorney; Kristen Nicole

Pulkstenis, of counsel and on the brief).

PER CURIAM

Defendant Keshaun D. Earley appeals from a June 29, 2023 Law Division order denying his petition for post-conviction relief (PCR) without an evidentiary hearing in connection with his 2014 convictions for first-degree murder and related weapons offenses. On appeal, defendant raises claims of ineffective assistance of counsel (IAC) and argues he is entitled to a new trial based on newly discovered evidence. Defendant also appeals numerous other rulings by the trial court, including a December 21, 2021 order partially denying his motion to compel discovery; a June 21, 2023 order denying his motion to compel discovery and vacating prior orders; a June 28, 2023 ruling denying his request for an adjournment; a June 29, 2023 order denying his motion for recusal; a July 14, 2023 order denying his motion for rehearing; and a July 14, 2023 order denying his motion for reconsideration. Based on our review of the voluminous record and the applicable legal principles, we affirm.

I.

On March 20, 2013, defendant was charged in a three-count Atlantic County indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1) to (2); second-degree possession of a handgun for an unlawful purpose, N.J.S.A.

2C:39-4(a); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b). Following a jury trial, defendant was convicted on all counts,[1] and sentenced to an aggregate term of forty years in prison, subject to the eighty-five percent parole ineligibility provisions of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

In an unpublished opinion, we affirmed defendant's convictions but vacated his sentence, finding that the court had engaged in impermissible double-counting. State v. Earley, No. A-5051-13 (App. Div. Mar. 17, 2017) (slip op. at 38-39). Subsequently, our Supreme Court denied certification, State v. Earley, 230 N.J. 537 (2017), and the United States Supreme Court denied certiorari, Earley v. New Jersey, 583 U.S. 1102 (2018). Defendant was resentenced by the trial court in July 2017 to an aggregate term of thirty years in prison, subject to NERA.

We incorporate by reference the detailed recitation of the facts contained in our unpublished opinion. To summarize, the charges against defendant

---

[1] Defendant filed two post-trial motions for a new trial pursuant to Rule 3:20-1, arguing that the eyewitness identification jury charge was erroneous and that the convictions were against the weight of the evidence. Defendant also filed a post-trial motion to dismiss the indictment, claiming his due process rights were violated because of the State's continued bad faith related to the destruction of surveillance footage. The trial court denied all three motions.

stemmed from the shooting death of James Jordan in Atlantic City on August 26, 2012, outside Carver Hall, the apartment community of Jordan's aunt, Nicole Jones. During the trial, the State produced eighteen witnesses consisting of civilians, law enforcement, a representative from Sprint, the telecommunications company, and a forensic pathologist. The defense produced one witness, a private investigator. Defendant did not testify at trial, but his taped statement to police was played for the jury during the State's case.

The State's case relied primarily on eyewitness identifications of defendant as the shooter by Jones, Ny-Taijah Ceasar, and Kevin Brown.[2] The three made these identifications both on the day of the murder and in court. Their testimony established that, shortly before noon on August 26, 2012,

> Jones sent Kevin Brown and an individual nicknamed "Meat" to buy food for [a] breakfast at the nearby High Gate apartment complex.
>
> When the two men returned, they were approached outside Carver Hall by Jordan, who was Jones's nephew. As Brown spoke with Jordan, "[defendant] . . . came from around the corner" with "a shirt tied around his face," which prompted Brown to ask Jordan "who was that[?]" When Jordan "blew [] off" his question, Brown "started backing off" because he thought he was being set up. The white tee shirt

_____

[2] We refer to Kevin Brown and Quaran Brown by their first and last names to avoid confusion caused by their common surname. In the passage incorporated from our unpublished opinion, we refer to Kevin Brown by his surname only.

initially prevented Brown from recognizing the gunman. Brown then saw the man fire one shot, striking Jordan. As Brown was still backpedaling, he saw the suspect's face after he dropped the gun, reached down for it, and the tee shirt fell from his face.

Brown ran into a nearby building, where he met Jones "a couple minutes after everything happened." Brown told Jones "it was Buddah"[3] who shot Jordan. Brown testified he knew defendant prior to the shooting because they had been "incarcerated a couple of times" together, and he had "seen him [on] the streets a couple of times," even though defendant "[didn't] hang out in that area."

When the shooting occurred, Jones was talking to her other guests in front of a window in the living room of her apartment. Jones testified that, after hearing the shot, she looked out the window and saw: "Budd[ah] dropped the gun, and when he went down to pick it up, he had a towel or like a shirt over his head that fell." She described the shooter, who[m] she identified as Buddah, as "ha[ving] brown skin, kind of tall, skinny," and wearing "a white short-sleeve shirt [], some blue jeans," with something white hanging from his head. At the same time, Jones's friend, . . . Ceasar, also yelled "that's Budd[ah], that's Budd[ah]." Jones testified she recognized the suspect as Buddah before Ceasar began shouting.

Before Jones went to the police station, she made phone calls in an attempt to ascertain Buddah's true identity. Jones testified she knew Buddah because

---

[3] Defendant's nickname, Buddah, alternately appears as Buddha in various portions of the record.

5

"[she had] seen him around a few times," and "[h]e came to [her] house like two times." She later testified she was not acquainted with defendant but had seen him at Carver Hall about three times in the two or three months before the shooting. According to Jones, Buddah "put the towel on his head" after it fell off before retrieving the black handgun. Jones saw Brown and Jordan, who[m] she did not know had been shot, run from the scene. She also saw Buddah run behind the building and out of her view before reappearing and running across Absecon Boulevard and the Brigantine connector road to a field on the other side.

Ceasar testified that she had been friends with defendant for several years at the time the shooting occurred. On that day, he was wearing "shorts, army fatigue material with a white shirt and a white shirt over his face." Ceasar stated she was looking out the window before the shooting and saw Buddah approach Brown and Jordan and then shoot Jordan. She observed: defendant had the gun in his hand as he approached; he shot the victim once; his shirt fell off his face for less than ten seconds; he picked the shirt and gun up; and ran across the highway. As this occurred, she yelled out the window, "oh my God, that's Budd[ah]."

. . . .

. . . Neither the gun nor any ballistics evidence was recovered. The State's forensic pathologist conducted an autopsy and testified that Jordan died from a gunshot wound to his chest.

[Earley, slip op. at 4-7 (all but first, fifth, ninth, fourteenth, sixteenth, and seventeenth alterations in original).]

6

In his taped statement to police, defendant repeatedly denied being in Atlantic City on the day of the shooting, first stating that he never left Mays Landing and only traveled between his Oakcrest Estates apartment and his girlfriend's house. Ultimately, however, defendant admitted that he went to Atlantic City, but after 2:00 p.m.

To counter defendant's alibi defense, the State proved defendant's opportunity to commit the murder through testimony, video footage, and documentary evidence. Detective Richard Johannessen testified that he extracted surveillance footage from four systems: one in Carver Hall, two in grocery stores in the High Gate apartment complex across the road from Carver Hall, and one in Oakcrest Estates, the apartment complex in Mays Landing where defendant lived. Detective Lynne Dougherty, the lead detective in the case, testified that she reviewed, analyzed, and preserved the video footage. Portions of the footage, which were admitted into evidence and played for the jury, demonstrated that the murder in Atlantic City occurred at about 12:10 p.m. and that defendant arrived at Oakcrest Estates around 12:43 p.m., wearing a "white or light-colored shirt." The State maintained that this period of time was long enough for defendant to drive from Atlantic City to Mays Landing.

7

Further, the State presented testimony from Sprint's custodian of records, Dwight Nichelson, who explained the call records for defendant's cell phone that were admitted into evidence. The records suggested that the phone remained in Mays Landing during the murder and showed three inbound calls from 12:00 p.m. to 12:15 p.m. ranging in length from 55 to 340 seconds. Given that the calls were over thirty seconds long and that the records showed no "forwarding roll" to voicemail took place, Nichelson testified it was likely "that the call[s] [were] answered and there was some kind of conversing that went on."

However, the records also showed that defendant did not make any outbound calls the day of the murder from after 12:09 a.m. until 12:58 p.m. As testimony from one of defendant's then girlfriends established that the cell phone was password-protected and that someone without the password could only answer incoming calls, the State maintained that someone else answered the phone. Moreover, the State asserted the records were probative of defendant's guilt since they showed that his "pattern" of returning phone calls and text messages was "all of a sudden" disrupted in the "block of time" around the murder.

In June 2018, approximately four years after defendant was sentenced, he filed a PCR petition alleging IAC. This commenced a protracted and convoluted

process that would span another five years. Defendant was appointed counsel, who (1) sent the State a letter dated September 27, 2018, requesting confirmation that the hard drive used to store the surveillance footage had been preserved; (2) filed a motion dated April 24, 2019, to compel the State to produce the hard drive (the 2019 motion); and (3) filed an amended PCR petition in March 2020.

Defendant's amended petition asserted, among other things, that his trial counsel was ineffective by: (1) failing to retain an expert to support his claim that "an eyewitness's asserted familiarity with the suspect does not mitigate the risks of misidentification"; (2) neglecting to seek production of the hard drive during trial; (3) not seeking "a stronger negative inference jury instruction" about surveillance footage that had been deleted from the hard drive; (4) failing to subpoena a Facebook representative to authenticate posts on defendant's Facebook account; (5) promising exonerating evidence in his opening statement; (6) failing to object to the prosecutor's remarks about ambidexterity during summation; (7) failing to procure testimony from Carol Johnson, a property manager who reportedly saw defendant at Oakcrest Estates the day of the murder; and (8) representing defendant despite previously representing the murder victim. Defendant also requested a plenary hearing on newly discovered

evidence, specifically, an alleged confession to Jordan's murder by a man identified as Quaran Brown.

In support of his claims, defendant submitted a certification by his PCR counsel; a June 1, 2020 report of Dr. Steven Penrod, an expert on eyewitness identification; a January 29, 2014 report by NuVida Data Forensics containing an integrated timeline of activity on defendant's cell phone and Facebook account; still shots from defendant's recorded statement and from the surveillance footage; a February 24, 2014 investigative report by Atlantic County Prosecutor's Office (ACPO) Sergeant Justin Furman concerning an examination of the hard drive; and other photographic and documentary evidence. Pertinent to his newly discovered evidence claim, defendant submitted notes handwritten by Kevin Taylor, who had been a fellow inmate of defendant in 2016; Taylor's signed certification dated February 14, 2019; and an interoffice memo from the Public Defender's Office documenting the investigation into the jailhouse confession.

On November 6, 2020, defendant filed a second motion to compel, this time for discovery related to Quaran Brown's prior convictions and a murder occurring in Atlantic City in July 2012 (the 2020 motion). A PCR judge heard oral argument on the merits of defendant's petition on March 11, 2021, but failed

to render a decision. On December 21, 2021, a different PCR judge heard arguments on the 2019 and 2020 motions to compel discovery. The judge denied the 2020 motion but granted the 2019 motion, ordering the State to determine the hard drive's whereabouts and determine whether it was fit for forensic analysis.

In response, the State informed defense counsel that it "no longer possesse[d] the hard drive." On April 7, 2022, alleging that the State violated an August 2013 order to preserve evidence, defendant moved for an order granting PCR relief or, in the alternative, deeming it a fact that he "did not arrive at and enter [Oakcrest Estates] . . . between 12:10 p.m. and 12:45 p.m." on the day of the murder. On April 12, 2022, the PCR judge declined to grant either of the requested reliefs but ordered the State to respond to interrogatories about the lost hard drive. Defendant's PCR counsel was later substituted. Substituted counsel served interrogatories on the State in March 2023, but the State refused to answer them, stating they sought "irrelevant information." Defendant then moved to compel the State to answer the interrogatories.

On June 21, 2023, a newly-assigned PCR judge issued an order denying the motion to compel and vacating the December 21, 2021 and April 12, 2022 orders as "improvidently granted." On June 27, defendant moved for

reconsideration of the June 21 order and requested an adjournment of oral argument on the pending PCR petition scheduled for the next day. On June 28, an hour before the hearing, defendant filed a motion for recusal and a motion for dismissal or for rehearing based upon newly discovered evidence of prosecutorial misconduct. The judge denied the adjournment request and the three motions on the record before conducting oral argument on the PCR petition.

On June 29, 2023, the judge issued an order and forty-two-page memorandum of decision denying defendant's PCR petition without an evidentiary hearing. In her decision, the judge meticulously reviewed the facts and procedural history, recounted the parties' arguments, applied the governing legal principles, and concluded defendant failed to establish a prima facie claim of IAC. Regarding defendant's motion for a new trial, the judge found Taylor's certification incredible and defendant's arguments unsupported, deeming them "self-serving," "conclusory," and "speculative at best." Accordingly, the judge concluded that defendant "failed to meet prong one of the test for [a] new trial based upon newly discovered evidence." The judge also issued an order the same day denying the motion for recusal before issuing orders on July 14, 2023,

12

denying the motions for reconsideration and for dismissal or rehearing.[4]  This

appeal followed.

On appeal, defendant raises the following Points for our consideration:[5]

> POINT I
>
> AS [DEFENDANT] ESTABLISHED A PRIMA
> FACIE CASE OF TRIAL COUNSEL'S
> INEFFECTIVENESS, THE COURT ERRED WHEN
> IT DENIED HIS PETITION FOR POST-
> CONVICTION RELIEF WITHOUT CONDUCTING
> AN EVIDENTIARY HEARING.
>
>> [(A) Defendant] Established A Prima Facie Case,
>> Requiring The Court Conduct An Evidentiary
>> Hearing And Vacate His Convictions.
>>
>>> (1) Trial Counsel's Failure To Retain And
>>> Use An Expert On Familiarity At Both The
>>> Wade[6] Hearing And Trial Hamstrung
>>> [Defendant's] Misidentification Defense.

---

[4]  The judge noted that the belated motion was an attempt "to amend the PCR" petition to include an additional IAC claim based on trial counsel's failure to obtain policies of the ACPO related to evidence retention.  Defendant also asserted that the policies were newly discovered evidence and therefore constituted an independent ground for a new trial.  Separate from her decision on defendant's PCR petition, the judge found defendant failed to present a prima facie claim of IAC or to meet the standard for a new trial in the July 14 order. We integrate these arguments into our analysis of defendant's broader PCR claims.

[5]  The Points have been reformatted for clarity and conciseness.

[6]  United States v. Wade, 388 U.S. 218 (1967).

(a) The Reliability Of Eyewitness Identifications, Especially The Role Of Familiarity, Was The Critical Jury Question, But Jurors Heard No Evidence That Would Assist Them In Evaluating It.

(b) [Defendant] Established A Prima Facie Case That The Failure To Consult, Obtain, And Use An Expert Witness Fell Below The Level Of Reasonable Behavior Expected Of Competent Counsel, And This Deficient Performance Prejudiced His Defense.

(2) Trial Counsel's Failure To Investigate And Enable Presentation Of Facebook Posts And Other Evidence Left Him Unable To Cement [Defendant's] Alibi.

(3) Trial Counsel's Inexplicable Failure To Demand Production Of The Hard Drive (Or Take Any Other Action) After Learning That ACPO Had Not, In Fact, "Wiped" It, Deprived [Defendant] Of The Opportunity To Fully Present His Alibi And Meaningfully Counter The State's Case.

(4) ACPO's Policies Regarding Preservation, Production, And Destruction Of Evidence Plainly Demonstrate That The ACPO Blatantly Violated Its Policies In This Case; Trial Counsel's Failure To Obtain Them Deprived The Defense Of Information Essential To Establishing ACPO's Bad Faith.

14

(5) Trial Counsel's Repeated Prior Representation Of The Victim And His Brother Warrants An Evidentiary Hearing On The Conflict Of Interest.

(6) Trial Counsel Overplayed His Hand In Opening By Promising To Prove [Defendant's] Innocence, Inviting The State's Damaging Remarks On His Failure To Provide Exonerating Evidence.

(7) Trial Counsel Was Ineffective For Failing To Investigate And Present Testimony Of Property Manager Carol Johnson, An Exculpatory Witness.

(8) Trial Counsel Was Ineffective In Failing To Object To The Prosecutor's Testimony In Summation Regarding Ambidexterity, And In Failing To Present Evidence Of [Defendant's] Left-Handedness.

(9) Counsel's Errors Cumulatively Denied [Defendant] Effective Representation.

POINT II

THE MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE SHOULD HAVE BEEN GRANTED.

(A) Newly Discovered Evidence of Third-Party Guilt.

(B) Newly Discovered Evidence of ACPO's Bad Faith and Misconduct.

15

POINT III

THE PCR COURT MADE A SERIES OF PROCEDURAL RULINGS THAT INDIVIDUALLY AND COLLECTIVELY DEPRIVED [DEFENDANT] OF DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL, REQUIRING REVERSAL.

(A) The PCR Court's Discovery Decisions Must Be Reversed.

(1) Discovery Related To The Hard Drive.

(a) [The PCR Court's] Denial Of [Defendant's] Motion To Enforce The Earlier Discovery Order Regarding The Hard Drive, Her Sua Sponte Vacation Of Prior Discovery Orders, And The Denial Of [The] Reconsideration Motion Were Improper And Demand Reversal.

(b) Alternatively, The Court Should Have Granted PCR Or The Alternative Relief Requested In The April 7, 2022 Motion: Deeming It A Fact That The Destroyed Footage Would Have Established [Defendant] Did Not Arrive By Car At Oakcrest Estates Between 12:11 And 12:45[ p.m.]

(2) The Court Should Have Permitted Discovery Related To The Viable Third-Party Defense.

(B) It Was Wholly Improper To Require Substituted Counsel To Proceed On The Merits

16

After She Repeatedly Protested That She Had Not Completed Investigating And Preparing The Case.

(C) As An ACPO Supervisor During The Entirety Of The Investigation And Prosecution Of [Defendant, The PCR Judge] Abused Her Discretion In Refusing To Recuse Herself From Passing Judgment On ACPO's Misconduct In Destroying Hundreds Of Hours Of Potentially Exculpatory Information, Failing To Retain The Hard Drive At The Center Of Substantial Pretrial Litigation On Spoilation, And Withholding ACPO's Policies From The Court And The Defense.

(D) The Denial Of [Defendant's] Motion For Dismissal Or Rehearing Based On Newly Discovered Evidence Of Bad Faith Must Be Reversed.

II.

Many of defendant's arguments center on the ACPO's partial deletion of the extracted surveillance footage and maintenance of the hard drive that stored the footage. Defendant argues that his trial counsel was ineffective for failing "to demand production of the hard drive" upon learning of Furman's February 24, 2014 report that "suggested this 'wiping' had not occurred at all." He contends that reviewing all of the footage would have corroborated his alibi, "such as showing that no car came between 12:11 [p.m.] and 12:42[ p.m.]" or showing him "around the complex that morning and midday, supporting other

17

aspects of his statement." Relatedly, defendant claims that the PCR judge erred in denying his discovery requests concerning the hard drive since Furman's report "showed good cause" and "interrogatories are [not] forbidden in PCR discovery."

Defendant further argues that he was prejudiced by his trial counsel's failure to obtain the "publicly available" evidence retention policies in effect at the ACPO during his case (ACPO policies) because he would have been able to show the State's bad faith and more "effectively cross-examin[e] ACPO personnel" at a pre-trial evidentiary hearing. He asserts that, with the benefit of the ACPO policies, the trial judge would have granted his motion to dismiss the indictment or given a mandatory adverse inference charge to the jury. Finally, defendant contends that he is entitled to a new trial because the ACPO policies were newly discovered evidence and the State's failure to produce them violated his constitutional rights under Brady.[7]

Our review of these claims is guided by well-settled legal principles. We "review the legal conclusions of a PCR court de novo," State v. Reevey, 417 N.J. Super. 134, 146 (App. Div. 2010), and "review under the abuse of discretion standard the PCR court's determination to proceed without an evidentiary

---

[7] Brady v. Maryland, 373 U.S. 83 (1963).

hearing," State v. Brewster, 429 N.J. Super. 387, 401 (App. Div. 2013). If the court "perceives that holding an evidentiary hearing will not aid the court's analysis of whether the defendant is entitled to [PCR], . . . then an evidentiary hearing need not be granted." State v. Marshall, 148 N.J. 89, 158 (1997). "[W]here . . . no evidentiary hearing was conducted," as here, we "may review the factual inferences the [PCR] court has drawn from the documentary record de novo." State v. Blake, 444 N.J. Super. 285, 294 (App. Div. 2016) (citing State v. Harris, 181 N.J. 391, 421 (2004)).

An evidentiary hearing for a PCR petition is only required when (1) a defendant establishes "a prima facie case in support of [PCR]," (2) the court determines that there are "material issues of disputed fact that cannot be resolved by reference to the existing record," and (3) the court determines that "an evidentiary hearing is necessary to resolve the claims" asserted. State v. Porter, 216 N.J. 343, 354 (2013) (alteration in original) (quoting R. 3:22-10(b)); see R. 3:22-10(e)(2) (providing "[a] court shall not grant an evidentiary hearing . . . if the defendant's allegations are too vague, conclusory or speculative").

"To establish a prima facie case, [a] defendant must demonstrate a reasonable likelihood that [the PCR] claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits." R. 3:22-

10(b). Moreover, a defendant must make this showing "by a preponderance of the credible evidence." State v. Goodwin, 173 N.J. 583, 593 (2002).

Rule 3:22-2 recognizes five cognizable grounds for PCR, including a "[s]ubstantial denial in the conviction proceedings of [a] defendant's [constitutional] rights," R. 3:22-2(a), which encompasses the right to the effective assistance of counsel at issue in this appeal, State v. Nash, 212 N.J. 518, 541-42 (2013). To establish a prima facie claim of the denial of the effective assistance of counsel as contemplated under Rule 3:22-2(a), a defendant must demonstrate that the performance of counsel fell below the objective standard of reasonableness set forth in Strickland v. Washington, 466 U.S. 668, 687-88 (1984), and adopted in State v. Fritz, 105 N.J. 42, 49-58 (1987), and that the outcome would have been different without the purported deficient performance. Stated differently, a defendant must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687; Fritz, 105 N.J. at 58.

To satisfy the first prong, a defendant must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and "that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88.

"[I]n making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."  Id. at 689.  As such, a defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

"Merely because a trial strategy fails does not mean that counsel was ineffective."  State v. Bey, 161 N.J. 233, 251 (1999).  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."  Strickland, 466 U.S. at 688-89.  For that reason,

> an otherwise valid conviction will not be overturned merely because the defendant is dissatisfied with [defense] counsel's exercise of judgment during the trial.  The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt.  As a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal "except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial."

21

[State v. Castagna, 187 N.J. 293, 314-15 (2006) (second alteration in original) (citations omitted) (quoting State v. Buonadonna, 122 N.J. 22, 42 (1991)).]

To satisfy the prejudice prong, "[t]he error committed must be so serious as to undermine the court's confidence in the jury's verdict or result reached." State v. Chew, 179 N.J. 186, 204 (2004) (citing Strickland, 466 U.S. at 694). This prong generally requires that a defendant establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Failure to meet either prong of the two-pronged Strickland/Fritz test results in the denial of a petition for PCR. State v. Parker, 212 N.J. 269, 280 (2012) (citing State v. Echols, 199 N.J. 344, 358 (2009)). That said, "courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient." State v. Gaitan, 209 N.J. 339, 350 (2012) (citation omitted) (citing Strickland, 466 U.S. at 697).

In his direct appeal, we addressed "defendant's contention that the trial court erred in denying his pre-trial and post-trial motions to dismiss the indictment based on the State's destruction of the bulk of the Oakcrest Estates surveillance footage." Earley, slip op. at 10. In that regard, after granting

22

defense counsel's motion to preserve evidence "includ[ing] but . . . not limited to . . . computer records . . . and all evidence which is exculpatory or which may lead to exculpatory evidence" on August 7, 2013, the trial court held a pre-trial evidentiary hearing on February 24, 2014, concerning defendant's motion to dismiss the indictment grounded on the State's destruction of surveillance footage from Oakcrest Estates. Dougherty testified she had reviewed the footage, "mainly focus[ing]" on the period from around noon to 12:43 p.m., the start of the footage "until . . . defendant [was] picked up" by one of his then girlfriends, April Tobias, in her car.

In our unpublished opinion, we recounted:

> In response to a July 3, 2013 defense request to view the video discovery, Dougherty instructed Sergeant Matthew Paley of the Computer Crimes Unit to extract two portions totaling thirty minutes out of the total 21[6] hours of video footage from the eighteen cameras. She testified: . . . "camera [six] was 12:20 to 12:40 [p.m.] . . . , and then camera [twenty-one] was 4:40 to 4:50 [p.m.], so [twenty] minutes and [ten] minutes." The first extracted portion captured an individual appearing to be defendant in a store, and the second extracted portion captured an individual appearing to be defendant on the playground with his daughter. The remaining Oakcrest Estates video footage that Dougherty did not direct Paley to extract was destroyed. [Paley] explained that once everything evidential is extracted, the remaining video is deleted and the hard drive [gets put "back into] service" for use in future cases.

23

[Earley, slip op. at 9-10 (third, fifth, sixth, and seventh alterations in original).]

Dougherty testified that she alone determined what portions of the Oakcrest Estates footage were relevant. Paley specified that after he extracted the video on July 5, 2013, Dougherty told him the remainder of the video was "no longer needed" and did not need to be retained. He stated he returned the hard drive to Johannessen so that it could be "wiped clean of all previous data" to be used in future investigations. Johannessen testified he did so using a "forensic wipe," which "wr[ote] over the hard drive and then reformat[ted] it." By the time of the pre-trial evidentiary hearing, the State maintained that the hard drive had been returned to inventory but could not be located.

In response to questioning by the trial court, the State represented that the ACPO had "thousands of policies and procedures" in place maintained in an online database. ACPO Captain Brian Barnett testified there was a "standard operating procedure on the destruction of evidence" for active cases. However, neither Barnett nor Dougherty knew what the evidence retention policy was.

In denying defendant's pre-trial motion to dismiss the indictment based on the destruction of the surveillance footage, the trial court applied the three factors bearing upon whether the destruction of physical evidence amounts to a due process violation identified in State v. Hollander, 201 N.J. Super. 453, 479

24

(App. Div. 1985), where we instructed courts to focus on "(1) whether there was bad faith or connivance on the part of the government; (2) whether the evidence . . . was sufficiently material to the defense; [and] (3) whether [the] defendant was prejudiced by the loss or destruction of the evidence." Ibid. (citations omitted). Although the trial court concluded that the destroyed evidence was material and that its destruction prejudiced defendant, the court did not find "bad faith or connivance on the part of the government," given that there "appear[ed] to be no recognizable or readily available" policy for maintenance, turning over, or retention of evidence. The court credited Dougherty's testimony that she reviewed the footage and then just "did what she was told" to do by superiors— "ma[ke] the call" on what video to delete.

The court nevertheless determined that the ACPO had violated Rule 3:13-3 and provided the following permissive adverse inference charge to the jury in the final instruction:

> You have heard testimony that the [ACPO] destroyed and failed to preserve video surveillance footage from Oakcrest Estates consisting of [twelve] hours each for [sixteen] cameras as well as approximately [twenty-three] hours, [thirty] minutes from another two cameras, spanning the approximate hours of [twelve] noon to [twelve] midnight on August 26, 2012. Under our court rules, the prosecutor has a duty to produce to the defense evidence in its possession following the return of an indictment. If you

25

find that the State has destroyed and failed to preserve evidence in its possession following the return of the indictment, then you may draw an inference unfavorable to the State which in itself may create a reasonable doubt as to . . . defendant's guilt. In deciding whether to draw this inference, you may consider all the evidence in the case, including any explanation given as to the circumstances under which the evidence was destroyed. In the end, however, the weight to be given to the destruction of the evidence is for you and . . . you alone to decide.

The court gave the jury a similar instruction during the State's case-in-chief.

At some point during trial, defense counsel received Furman's February 24, 2014 report that stated Furman "was present for a forensic examination" of the hard drive, which had been located. The report stated that investigators "were able to retrieve portions of the footage from Oak[crest] Estates" but that those portions were the same two clips submitted as evidence, with the remainder confirmed as written over and irretrievable. Defense counsel took no immediate action in response to the report.

Later, defense counsel filed a post-trial motion to dismiss the indictment, alleging that the forensic examination conducted by the Computer Crimes Unit was insufficient and that the timing of the report was indicative of bad faith. The trial court denied the motion, finding that "the report . . . confirmed what

26

was already known" from the evidentiary hearing—that the two clips in evidence were the only pieces of footage not overwritten by Johannessen.

In our unpublished opinion, we concluded that defendant "failed to demonstrate a due process violation." Earley, slip op. at 18. We explained:

> First, defendant has not demonstrated that the erased portion of the video had exculpatory value that was apparent before it was destroyed. Nor has defendant met his burden to establish bad faith. Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Our courts have held that the routine destruction of video or other data does not establish bad faith. . . .
>
> Moreover, the fact that a discovery request was made prior to the routine destruction of evidence does not compel a finding of bad faith. There is no evidence of "official animus toward [defendant] or [] a conscious effort to suppress exculpatory evidence." California v. Trombetta, 467 U.S. 479, 488 (1984).
>
> [Earley, slip op. at 17-18 (alterations in original) (citations omitted and reformatted).]

We also "concluded that the State was not at liberty to destroy the video," particularly given "the State's awareness of the defense request and the potential relevance of the video footage." Id. at 18-19 (citing R. 3:13-3). "However, we discern[ed] no abuse of discretion in the court's permissive inference charge" as an appropriate sanction and rejected defendant's contention that "a stronger instruction" was warranted. Id. at 19-20.

27

In denying defendant's IAC claims based on his trial counsel's failure to demand production of the hard drive during the trial, the PCR judge found that counsel had "limited time to file a [m]otion regarding the hard drive based upon the information" in Furman's report, so the decision not to request the hard drive was trial strategy and "reasonable under the circumstances."[8]   We agree. Defendant's claims are "bare allegation[s]" unsupported by the factual record. State v. Cummings, 321 N.J. Super. 154, 168 (App. Div. 1999).   Although "[c]ounsel has a duty to make reasonable investigations," Porter, 216 N.J. at 353 (quoting Chew, 179 N.J. at 217), nothing in Furman's report suggested that video evidence other than the two clips already in evidence existed on the hard drive. Under the circumstances, defense counsel's decision not to request the hard drive for an independent examination was reasonable and does not constitute deficient performance under Strickland.

Even assuming counsel's performance was deficient, defendant cannot demonstrate he was prejudiced by the decision.  See Bey, 161 N.J. at 284-85

---

[8]   Defendant correctly notes the PCR judge applied the wrong standard by finding he could not "prove by clear and convincing evidence" that the hard drive contained exculpatory evidence.  He notes the same for his claims related to Johnson.  Based on our de novo review, we affirm despite these errors because the judge came to the correct conclusion, and "[w]e are free to affirm the trial court's decision on grounds different from those relied upon by the trial court." State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011).

A-3822-22

(noting the decision not to retain independent expert was not IAC where it would not have affected outcome of motion for new trial). At no point during trial or the post-conviction proceedings has defendant provided any evidence that the raw footage corroborated his alibi as argued in his petition. Compounding this, arguments over the hard drive's contents are futile as it has not been in the State's possession since at least 2022. Simply stated, defendant cannot show the hard drive contained exculpatory evidence at this juncture.

We also discern no error in the PCR judge's related rulings denying defendant's motion to compel discovery and vacating the prior PCR judge's orders. We review a PCR court's discovery order for abuse of discretion. State v. Herrera, 211 N.J. 308, 328 (2012). As our court rules do not authorize discovery in PCR proceedings, Marshall, 148 N.J. at 268, "[o]nly in the unusual case will a PCR court invoke its inherent right to compel discovery," Herrera, 211 N.J. at 328 (quoting Marshall, 148 N.J. at 270). It is only "where a defendant presents the PCR court with good cause to order the State to supply the defendant with discovery that is relevant to the defendant's case and not privileged[ that] the court has the discretionary authority to grant relief." Marshall, 148 N.J. at 270. A showing of "good cause" requires more than "'a generic demand for potentially exculpatory evidence,'" and the defendant "'must

allege facts that, if proved, would entitle[] him [or her] to relief.'" State v. Szemple, 247 N.J. 82, 107-08 (2021) (first quoting Commonwealth v. Williams, 86 A.3d 771, 786 (Pa. 2014); and then quoting State v. Turner, 976 So.2d 508, 511 (Ala. Crim. App. 2007)).

Here, the PCR judge posited that the issues "presented in conjunction with the [discovery requests]," specifically the IAC claims related to the hard drive, were "resolvable within the court record." The judge also found that the claim was "essentially being used as a basis to relitigate the [m]otion to [d]ismiss," which we had "already . . . reviewed and affirmed." We agree. Defendant did not have good cause to demand the hard drive because no record evidence indicated it contained exculpatory evidence. For this reason, we also find that the judge did not abuse her discretion by denying defendant's interrogatories seeking information related to the disposal of the hard drive. See State v. Enright, 416 N.J. Super. 391, 404 (App. Div. 2010) ("[A]llowing a defendant to forage for evidence without a reasonable basis is not an ingredient of either due process or fundamental fairness in the administration of . . . criminal laws." (emphasis omitted) (quoting State v. Ford, 240 N.J. Super. 44, 49 (App. Div.

1990), rejected in part on other grounds by, State v. Stein, 225 N.J. 582 (2016))).[9]

Turning to defendant's arguments regarding trial counsel's failure to obtain the ACPO policies, defendant's PCR counsel obtained the policies through a public records request. The policies required preservation of "video tape recordings" and "electronically stored information on seized media" in homicide cases for "[ten] years from the date of conviction." Because defendant was convicted in 2014, the ACPO was required to preserve the surveillance footage through the pendency of his PCR proceedings.

In ruling on defendant's related IAC claim, the PCR judge determined that defendant failed to show a prima facie case under both Strickland prongs. In support, the PCR judge relied on the fact that the trial judge had found no bad faith despite the policies being brought to his attention at the pre-trial evidentiary hearing. The PCR judge found "the directives [would have] added nothing to [the trial judge's] consideration and would not have had a material [effect] on the result of the case." Critically, the PCR judge concluded that

---

[9] Defendant claims in a Point heading that the judge erred in denying his motion to reconsider her order on his discovery requests but fails to argue further or cite any law. Accordingly, we consider the argument abandoned. See Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2025) ("[A]n issue not briefed [on appeal] is deemed waived.").

because the directives "did not restrict [the trial judge] from . . . provid[ing] two sets of strongly worded curative instructions" and defendant was convicted regardless, the "evidence would not have had a material bearing" on the verdict.

We again agree. The State's production of the ACPO policies would not have changed the fact that Dougherty was ignorant of them, or the trial judge's finding that she did not act in bad faith because she "[did not] understand the discovery responsibilities." At trial, the jury heard the permissive adverse inference instructions as well as Dougherty's admission that she deleted most of the surveillance footage two days after defense counsel requested it. Because the jury still convicted defendant and the State's explanation of Dougherty's ignorance would not have been vitiated by the production of the policies, trial counsel obtaining the policies would not have changed the jury's verdict.

Defendant's <u>Brady</u> claims likewise fail because of this lack of materiality. "In order to establish a <u>Brady</u> violation, [a] defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material." <u>State v. Russo</u>, 333 N.J. Super. 119, 134 (App. Div. 2000). "The materiality standard is satisfied if [the] defendant demonstrates that there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different."

Ibid. Because it is unlikely the results of the pre-trial evidentiary hearing or the trial would have been different, the State's failure to produce the policies was not a Brady violation.

Defendant's claim that the ACPO policies are newly discovered evidence of the State's bad faith is also unavailing. First, as defendant "could have raised the issue on direct appeal but failed to do so," his claim is procedurally barred under Rule 3:22-4. State v. Peoples, 446 N.J. Super. 245, 254-55 (App. Div. 2016). Notwithstanding the procedural bar, we address the merits.

In order to justify a new trial, new evidence must be: "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." Nash, 212 N.J. at 549 (quoting State v. Carter, 85 N.J. 300, 314 (1981)). All three prongs must be satisfied before a new trial is warranted, and the defendant bears the burden of establishing each. State v. Ways, 180 N.J. 171, 187 (2004).

"Material evidence" under the first prong is "'any evidence that would have some bearing on the claims being advanced,' and includes evidence that supports a general denial of guilt." Nash, 212 N.J. at 549 (quoting Ways, 180

N.J. at 188). In other words, the new evidence must "have the probable effect of raising a reasonable doubt as to the defendant's guilt" to "not be considered merely cumulative, impeaching, or contradictory." Ibid. (quoting Ways, 180 N.J. at 189). In this sense, the first and third prongs are "inextricably intertwined," and "'evidence [that] would shake the very foundation of the State's case and almost certainly alter the earlier jury verdict' could not be categorized as 'merely cumulative.'" Ibid. (alteration in original) (quoting Ways, 180 N.J. at 189). Whether the newly discovered evidence has the potential to alter a verdict is a contextual determination, as "[t]he evidence [proffered] must be 'evaluated in light of the . . . corroborative proofs in the record.'" State v. Fortin, 464 N.J. Super. 193, 221 (App. Div. 2020) (omission in original) (quoting Herrera, 211 N.J. at 343).

In denying the motion for a new trial, the PCR judge explained that

> [t]he existence of these policies was discussed at length by [the trial judge] at the underlying [p]re-[t]rial [m]otion to [d]ismiss . . . hearing on February 24, 2014. In said hearing, . . . Barnett testified that a policy existed in writing at the ACPO relating to the destruction of evidence in a pending prosecution. The existence of these policies was therefore known to [defendant], and the policies could have been requested by [him] at any time . . . [but] were not until early 2023. The new request does not make the policies newly discovered evidence.

[(Citation omitted).]

We agree and adopt the judge's cogent reasoning. Besides the fact that the ACPO policies could have been discovered with reasonable diligence, they are not the sort of evidence that would have likely changed the verdict if a new trial were granted. Nash, 212 N.J. at 549. Consequently, we are satisfied defendant has not met his burden.

Relying on State v. M.B., 471 N.J. Super. 376 (App. Div. 2022), defendant asserts the State violated the 2013 preservation order and its own policies by destroying the hard drive, demonstrating its "further misconduct" and constituting "manifest harm." In M.B., we held that "'[i]n the absence of bad faith, relief should be granted to a defendant only where there is a "showing of manifest prejudice or harm" arising from the failure to preserve evidence.'" Id. at 383 (quoting State v. Dreher, 302 N.J. Super. 408, 489 (App. Div. 1997), abrogated on other grounds by, State v. Brown, 170 N.J. 138 (2001)).

Here, the preservation order only required the preservation of evidence which was "exculpatory or . . . [could] lead to exculpatory evidence." As previously stated, all record evidence establishes that no video evidence remained in the hard drive other than the two video clips already in evidence. Further, the ACPO policies merely required preservation of video evidence, not

the office hardware once used to store the video itself. Defendant has thus failed to show the State's bad faith or that he was manifestly harmed or prejudiced by the loss of the hard drive.

Lastly, defendant argues that the judge abused her discretion in denying his motion for recusal because she "was an ACPO supervisor . . . during ACPO's investigation and prosecution of [him]" and should not have ruled on his claims of ACPO's bad faith. He alleges that her "knowledge of ACPO's policies" and "ACPO's conflicting representations with respect to those policies" rendered her partial or caused "the appearance of impropriety."

A motion for disqualification or recusal is "entrusted to the sound discretion of the judge," whose decision is "subject to review for abuse of discretion." State v. McCabe, 201 N.J. 34, 45 (2010). Rule 3.17(B) of the Code of Judicial Conduct states that "[j]udges shall disqualify themselves in proceedings in which their impartiality or the appearance of their impartiality might reasonably be questioned." Among other examples, the Code includes "[p]ersonal bias, prejudice or knowledge" and "prior professional relationships." Ibid. For the former, the Code counsels against judges presiding over cases where they "have personal knowledge of disputed evidentiary facts involved in the proceeding." Id. r. 3.17(B)(1). For the latter, it specifies that a judge should

not preside over a case "in which a party is a [local] governmental entity that previously employed the judge" for five years. Id. r. 3.17(B)(4)(d). Still, "[j]udges may not 'err on the side of caution and recuse themselves unless there is a true basis that requires disqualification.'" Goldfarb v. Solimine, 460 N.J. Super. 22, 31 (App. Div. 2019) (quoting Johnson v. Johnson, 204 N.J. 529, 551 (2010) (Rabner, C.J., concurring)).

Applying these principles, the PCR judge denied the recusal motion. In support, she noted that she "resigned from the [ACPO] at the end of June 2017" and was thus "removed from [her] employment . . . for six years at the time of hearing th[e] motion." Regarding her personal knowledge, she stated:

> In 2012, 2013, and 2014, the relevant time frame of the underlying criminal case, I was Chief of Sex Crimes, Crimes Against Children, and the Financial Crimes Unit. I was not ever the Chief of the Major Crimes Unit. I had no supervisory authority and took no actions on anything related to this matter. I had no decision-making authority. I was not a witness to this matter, nor did I sit in on meetings regarding this matter. The only knowledge I have of the facts and evidence in this case is through the PCR submissions and arguments.
>
> I have never authored any policies for the [ACPO], including such regarding the preservation and destruction of evidence.

We discern no abuse of discretion in the judge's ruling. The judge was far removed from her tenure at the ACPO and had no prior personal knowledge of the facts involved in defendant's prosecution. Thus, there was no basis to question the judge's impartiality or the appearance of her impartiality. See Harris, 181 N.J. at 510-11 (holding that a PCR judge was not required to disqualify himself even though he was the acting county prosecutor when an unrelated indictment was returned against the defendant twenty-five years earlier).

III.

Next, defendant claims that his trial counsel was ineffective by failing to retain and use an expert at the pre-trial Wade hearing and at trial to dispute the reliability of eyewitness identifications by those "familiar" with the identified person, and instead telling the jury about the "common experience" of mistaking a stranger for an acquaintance. Defendant asserts this failure also caused the "premature termination" of the Wade hearing, which in turn prevented effective cross-examination of the eyewitnesses, whose "prior contacts with [him] were minimal at best."

In our unpublished opinion, we considered defendant's challenge to "the identification procedure employed by the State." Earley, slip op. at 23.

Defendant had argued the procedure was "impermissibly suggestive and that the resulting witness identifications should have been excluded." Ibid. We recounted that the trial court granted a Wade hearing on February 25, 2014, "based on the fact [that] the [three] eyewitnesses were shown only a single photograph of defendant." Id. at 28; see Wade, 388 U.S. at 229-30 (discussing inherent risk of suggestiveness in identification procedures). Dougherty was the sole witness at the hearing. She testified that she took statements from Ceasar and Jones separate from one another on the day of the murder but confirmed that Ceasar reported exclaiming "oh my God, it's Buddah," in the presence of Jones while the shooting was occurring.

According to Dougherty, both women named defendant as the shooter by his first name and as Buddah during their interviews. Ceasar told Dougherty that she and defendant "used to talk," which Dougherty understood to mean that they had dated. Jones informed Dougherty that "she had known [defendant] for about eight years" and knew personal information about him such as where the mother of his daughter lived. Because the women were familiar with defendant, Dougherty showed them each a single photograph of him. Ceasar "[a]lmost immediately" identified the person in the photo as defendant, saying something like "that's exactly him." Jones also identified defendant after "[v]ery briefly"

39

looking at the photograph. Ceasar and Jones each initialed and dated the respective photographs.

Kevin Brown was interviewed the following day. Dougherty arrived midway through his statement. He had already identified defendant as the shooter and stated he had known him "[a]pproximately [ten] years." Dougherty showed him a single photograph of defendant, and he "confident[ly]" identified defendant before initialing and dating the photograph. The statements of all three eyewitnesses were recorded on video, and the recordings were played for the court. Dougherty testified that there was no "question in [her] mind as to who[m] they thought the shooter was before [she] showed them th[e] photograph[s]."

After outlining the governing legal principles, including the expanded number of factors announced in State v. Henderson, 208 N.J. 208, 248-72 (2011), informing the court's determination of the reliability of identification evidence and specifically identifying eight system and ten estimator variables, the judge terminated the Wade hearing and found "defendant's allegation of improper suggestiveness . . . groundless." See Henderson, 208 N.J. at 248-61 (defining system variables as characteristics of the identification procedure over which law enforcement has control, and estimator variables as factors beyond

the control of law enforcement which relate to the incident, the witness, or the perpetrator).[10]

At trial, all three eyewitnesses testified about their out-of-court identifications of defendant. They also identified defendant in court. Dougherty testified about the out-of-court identifications and the procedures she used for Ceasar and Jones. During cross-examination and summations, defense counsel attacked the eyewitnesses' familiarity with defendant, noted they only had a "split[ ]second" to observe the shooter, and highlighted discrepancies between their police statements and testimony and between their descriptions of defendant and his actual appearance. The trial judge's final instruction to the jury tracked the model jury charge effective at the time, including the Henderson factors applicable to the case, such as witness stress, duration, weapon focus, distance, lighting, disguise or changed appearance, prior description of the

---

[10] Henderson prescribed a four-step procedure for determining admissibility of identification evidence. Id. at 288-89. First, to obtain a hearing, a defendant has the burden of producing some evidence of suggestiveness, generally tied to a system rather than estimator variable, that could lead to a mistaken identification. Ibid. Second, the State must offer proof the identification is reliable, "accounting for system and estimator variables." Id. at 289. Third, the burden remains on the defendant "to prove a very substantial likelihood of irreparable misidentification." Ibid. And, fourth, if the defendant sustains this burden, the identification evidence should be suppressed; if the defendant does not sustain the burden, the evidence should be admitted with "appropriate, tailored jury instructions." Ibid.

perpetrator, confidence and accuracy, and time elapsed. See Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (effective Sept. 4, 2012).

In our unpublished opinion, we rejected "defendant's claim that the out-of-court show-up of defendant's photo resulted in a very substantial likelihood of irreparable misidentification." Earley, slip op. 28. We reasoned that "[t]he majority of the estimator variables have little or no application when the witness knows the suspect from previous dealings and can identify the person based upon those prior contacts." Id. at 29. We noted that "the three eyewitnesses were well familiar with defendant." Ibid. "We likewise discern[ed] no error in the court's jury instruction on identification . . . ." Ibid. We also held that "[c]ontrary to defendant's argument, the trial court reasonably exercised its discretion to terminate the [Wade] hearing after it heard Dougherty's testimony and viewed the recorded identifications," because "'[t]he court can end the hearing at any time if it finds from the testimony that defendant's threshold allegation of suggestiveness is groundless.'" Ibid. (quoting Henderson, 208 N.J. at 289).

To support his PCR petition, defendant submitted Penrod's expert report, which concluded that many factors "have a cumulative effect on [eyewitness]

identification performance." Penrod also opined that "factors known to influence stranger identifications can similarly influence non-stranger identifications" and that "jurors are strongly influenced by witness assertions of familiarity."

In rejecting defendant's IAC claim based on trial counsel's failure to retain an identification expert, the PCR judge found that it was "not likely that an expert on [identification] would have been admitted at . . . trial" because "[t]he Henderson Court stated that 'with enhanced jury instructions, there will be less need for expert testimony,'" 208 N.J. at 298, and the jury charges on eyewitness identification "were in fact enhanced in 2012." Regardless, the judge found defendant failed to meet both Strickland prongs, as (1) his trial counsel made a strategic decision not to call an expert to "minimize the weight the jury gave to the identifications," and (2) defendant only argued expert testimony "would have promoted greater juror understanding of the pitfalls of relying upon familiarity as a benchmark for an identification's accuracy."

We agree with the judge's ruling and reasoning. Trial counsel's decision to not present an identification expert "followed a sound strategic approach to the case." State v. Pierre, 223 N.J. 560, 579 (2015) (acknowledging that deciding which witnesses to call at trial is "one of the most difficult strategic

43

decisions that any trial attorney must confront" (quoting State v. Arthur, 184 N.J. 307, 320 (2005))); Dunn v. Reeves, 594 U.S. 731, 739 (2021) ("Defense lawyers have 'limited' time and resources, and . . . certain tactics carry the risk of 'harm[ing] the defense' by undermining credibility with the jury or distracting from more important issues." (alteration in original) (quoting Harrington v. Richter, 562 U.S. 86, 106-08 (2011))). Consequently, "strategic decisions— including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness," ibid. (quoting Harrington, 562 U.S. at 104), and "are virtually unassailable on [IAC] grounds," State v. Cooper, 410 N.J. Super. 43, 57 (App. Div. 2009).

Defendant has not overcome the presumption that his trial counsel made a reasonable and informed decision not to call an expert. Even if the expert's testimony was admitted, calling an identification expert would likely have been met with an opposing expert by the State, highlighting and bolstering the accuracy of the eyewitnesses' identifications. Moreover, expert testimony could have distracted from counsel's common-sense arguments centering on the eyewitnesses' inconsistences and inability to view the shooter before he fled. Because there is no question that defense counsel vigorously engaged in the adversarial process, pro-actively filing the pre-trial motion to suppress the

identifications, forcefully cross-examining the eyewitnesses, and repeating his credibility arguments in closing, we are satisfied defendant failed to make a prima facie showing of deficient performance to satisfy the first Strickland prong.

Likewise, defendant cannot show a reasonable likelihood that calling an expert at trial would have resulted in a different verdict to satisfy the second Strickland prong. Penrod's opinion did nothing to directly discount the identifications, and the jury clearly credited the identifications despite defense counsel's impeachment of the eyewitnesses and the model jury charge's discussion of the Henderson factors. Consequently, we conclude defendant failed to make a prima facie showing of both Strickland prongs.

IV.

Next, defendant argues his trial counsel was ineffective for "promising to prove [defendant's] innocence" in his opening statement, thus "inviting the State's damaging remarks on his failure to provide exonerating evidence" during its closing argument. Defendant notes we found the "ill-advised opening permitted" the State a fair response in our unpublished opinion and that the "record is silent as to any possible strategic reason for counsel making such a promise." See Earley, slip op. at 32-34.

In our unpublished opinion, we recounted:

> [I]n his opening statement, defense counsel stated to the jury:
>
>> I'll tell you this: The defense will prove that [defendant] is innocent. We don't have to, we shouldn't have to, but here we are today and he's on trial for a murder he didn't commit. We don't have to prove it, but we will. And, you know, I don't say that lightly. That's a big promise I'm making to you, and I got to hope I fulfill it for my client's sake, for a man who's on trial for a murder he did not commit.
>
> In his summation, the prosecutor responded:
>
>> Now, [defense counsel] is absolutely right. He does not have to prove a single thing to you, but he said he would. He said in the beginning he was going to prove his client was innocent, his client was not in Atlantic City on that day. So what does he do? Well, he takes out a lot of cell phone records, and [defense counsel] is very technologically savvy. He knows all the terms for the cell phone records, he knows all the terms for the text messages, and he says, [] look at these texts, look at these cell phone records, but he doesn't prove a thing. He doesn't have to, but he didn't. Absolutely no evidence was put forward in this case to prove that [defendant] was anywhere but Atlantic City murdering James Jordan.
>
> [Id. at 32-33 (first alteration added).]

We rejected defendant's claim that the prosecutor's remarks were improper, explaining that the "comments did not impermissibly shift the burden of proof to defendant to prove his alibi," but rather "represented a direct response to the promise defense counsel made in his opening statement that defendant would prove his innocence." Id. at 33. Further, because the trial court instructed the jury in its final charge "that defendant had no obligation to prove his alibi," and because "'[w]e presume that the jury faithfully follow[ed] [the court's] instruction[s],'" any "prejudice" engendered by the comment was "neutralize[d.]" Id. at 33-34 (third alteration in original) (quoting State v. Miller, 205 N.J. 109, 126 (2011)).

In rejecting defendant's IAC claim premised on trial counsel's opening promise, the PCR judge found that the promise was a "strategic choice in an attempt to establish [defendant's] alibi," supported by the "cell phone records and other evidence" the defense presented, and that the trial court's jury instruction "specifically emphasize[d] that the burden was not upon [defendant] to demonstrate [an alibi], thus rebutting the need for [counsel] to satisfy the opening promise."

We agree and affirm the PCR judge's ruling substantially for the same reasons. Trial counsel's performance was not constitutionally deficient "merely

47

because . . . defendant is dissatisfied with his . . . exercise of judgment during the trial." Castagna, 187 N.J. at 314. The proposition that "[d]ecisions as to trial strategy or tactics are virtually unassailable on [IAC] grounds," Cooper, 410 N.J. Super. at 57, extends to an attorney's opening statement. Indeed, even high-risk strategies are not plainly IAC if they are reasonably calculated to lead to a favorable trial outcome. See Castagna, 187 N.J. at 303, 316 (finding no prima facie case of IAC where defense counsel admitted defendant's guilt to lesser offenses in hopes of building defendant's credibility with jury and getting acquittal on murder charge).

Trial counsel's opening statement was one part of a trial-long effort to establish an alibi by showing that defendant was using his phone in Mays Landing during the murder. The decision was a reasonable strategic effort to rebut the three eyewitness identifications claiming defendant committed the murder in Atlantic City and to establish reasonable doubt in the minds of the jurors. Critically, the defense's opening statement, the prosecutor's summation, and the trial court's jury instruction all made it clear that it was not defendant's burden to prove his alibi. Defendant therefore cannot show that but for the opening promise, there was a reasonable probability the jury would have acquitted him.

V.

Defendant's next arguments pertain to his alibi defense. He contends that trial counsel was ineffective for failing to "investigate and enable presentation of Facebook posts and other evidence" placing him in Mays Landing during the murder. Specifically, he argues counsel should have "subpoenaed a [Facebook] representative" to authenticate account records, "[sought] more complete records from Facebook" showing he was the person that had "accepted . . . friend requests," and "determine[d] whether another witness could have verified that Facebook messages had come from [defendant]." He further asserts that counsel was deficient for failing to call Oakcrest Estates property manager Carol Johnson, who, while "not precise on the time," "told police she had seen [defendant] walking around" Oakcrest Estates "earlier in the day." He claims her testimony would have corroborated that he was the unidentified man seen on surveillance footage at Oakcrest Estates "[nine] minutes post[ ]shooting."

The PCR judge summarized the relevant factual background as follows:

> In an attempt to establish an alibi during [t]rial, [t]rial [c]ounsel presented geospatial location data for [defendant's] phone from before, during, and after the murder occurred. The data showed [defendant's] phone in Mays Landing and not Atlantic City at the time of the murder. Thus, [defendant] claimed he could not have committed the murder because he was in Mays Landing at the time of the incident with his phone. The

49

[p]rosecutor refuted this contention by arguing to the jury that [defendant] left his phone in Mays Landing while he committed the murder in Atlantic City. The [p]rosecutor argued to the jury that all of [defendant's] phone pings to local cell phone towers were incoming to [defendant's] phone . . . [and that defendant] did not answer or otherwise respond to the incoming calls and communications . . . . In other words, the geospatial data and cell phone record history did not show [defendant] was using his phone at the time of the murder . . . .

       . . . .

       During the discovery phase . . . , [t]rial [c]ounsel submitted a list of Facebook postings that had been screenshot[ted] from [defendant's] Facebook account by the [d]efense along with the cell phone records and geospatial data. Trial [c]ounsel attempted to cross-examine . . . Dougherty[] to seek to have her acknowledge the Facebook records. The [p]rosecution objected, claiming hearsay and lack of foundation, as [t]rial [c]ounsel had not produced a witness to authenticate the records and to say what they meant. The objections deterred the offer, the [c]ourt expressed its view as to hearsay, and the Facebook record[s] never made it to the jury.

       [(Citation omitted).]

The PCR judge then rejected the IAC claim, finding that defendant failed to establish the second Strickland prong. In support, the judge explained that although defendant's "cell phone was in use for texts, calls, and Facebook nearly all morning from 11:33[ a.m.] to 12:35[ p.m.]," the phone and Facebook records

did not "demonstrate whether [defendant] was the individual using his phone." Because the Facebook posts established nothing more than the admitted phone records, which were "more pertinent to demonstrating activity by [defendant] due to the call that was answered by [defendant's] phone less than a minute before the murder," the judge determined the Facebook posts were "merely cumulative evidence."

We agree with the ruling and adopt the judge's reasoning. Because defendant claims his trial attorney inadequately investigated his case, he "must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification." Porter, 216 N.J. at 353 (quoting Cummings, 321 N.J. Super. at 170). That is because "PCR 'is not a device for investigating possible claims, but a means for vindicating actual claims.'" Marshall, 148 N.J. at 270 (quoting People v. Gonzalez, 800 P.2d 1159, 1206 (Cal. 1990)).

In his certification, defendant averred that he "made th[e Facebook] postings [while] in possession of his own phone in Mays Landing." However, defendant failed to corroborate his claim that he was responsible for the activity on his Facebook account near the murder, specifically, the friend requests that

were accepted at 12:04 p.m. and 12:07 p.m. See generally In re Robertelli, 248 N.J. 293, 301-02 (2021) (establishing mechanics of accepting Facebook friend requests). Indeed, any person who had access to defendant's Facebook account, especially if defendant were permanently logged into his account on a device, could have made the posts without inputting login credentials. Thus, defendant's claim amounts to nothing more than a "bare allegation." Cummings, 321 N.J. Super. at 168. The absence of an affidavit or certification establishing that further inquiry into Facebook's databases would have yielded exculpatory evidence is fatal to defendant's failure to investigate claim. See Porter, 216 N.J. at 353.

Turning to defendant's IAC claim regarding Johnson, the PCR judge found the decision not to call her was not deficient performance because Johnson never established when defendant was at Oakcrest Estates and calling her would have exposed her identification to cross-examination. The judge concluded defendant also failed to show prejudice because Johnson's identification was "not outcome determinative" and the "verdict relied upon the identifications at the scene by eyewitnesses, not the failure of [defendant] to establish an alibi."

We agree that defendant failed to show prejudice because Johnson's identification was not probative of defendant's alibi. See State v. L.A., 433 N.J.

Super. 1, 15 (App. Div. 2013) ("In addressing an [IAC] claim based on a counsel's failure to call an absent witness, a PCR court must unavoidably consider whether the absent witness's testimony would address a significant fact in the case . . . ."). To establish an alibi defense, defendant had to show that he was at Oakcrest Estates at or very near the time of the murder, 12:10 p.m. At trial, the State did not dispute that defendant was at Oakcrest Estates about thirty minutes after the murder. Johnson's statement neither identifies any precise time that defendant was at Oakcrest Estates nor corroborates defendant's claim that he was the unidentified man in the white shirt seen around 12:25 p.m. on the Oakcrest Estates surveillance footage. In fact, the statement is cumulative of evidence already in the case.

Further, unlike the decisions he cites that found IAC for failure to call a witness, defendant provided no certification or testimony from Johnson to supplement her prior statement and support his case. See State v. Petrozelli, 351 N.J. Super. 14, 20-21, 24-25 (App. Div. 2002) (remanding for evidentiary hearing where affidavits of uncalled witnesses established defense); L.A., 433 N.J. Super. at 9, 19 (finding IAC where witness submitted certification to PCR court asserting she was available for trial testimony and that assault could not have happened due to her presence); Wilson v. Cowan, 578 F.2d 166, 167-68

53

(6th Cir. 1978) (finding IAC for failure to call witness at trial who testified to defendant's alibi at habeas proceeding); Lawrence v. Armontrout, 900 F.2d 127, 129-30 (8th Cir. 1990) (finding counsel deficient for failing to make any personal effort to contact alibi witnesses after counsel admitted as such at evidentiary hearing); Alcala v. Woodford, 334 F.3d 862, 870-71 (9th Cir. 2003) (finding counsel deficient for failing to present alibi witness who submitted exculpatory statement for evidentiary hearing).  Accordingly, we conclude defendant's IAC claim for failure to call Johnson also fails.

VI.

Next, defendant contends that trial counsel erred by "failing to object to the prosecutor's testimony in summation" about a "friend's son" who is ambidextrous, "permitting the prosecutor to essentially testify" to something outside the record.  He also alleges counsel failed "to present evidence of [his] left-handedness" other than a "video of him signing with his left hand."

At trial, Tobias confirmed that the unidentified man from the surveillance footage seen at Oakcrest Estates near the time of the murder was "[d]rinking something" with his left hand.  During closing argument, defense counsel argued defendant was this man since his taped statement to police showed him signing

54

a Miranda[11] card with his left hand.  Counsel also claimed defendant could not be the murderer since the Carver Hall surveillance footage showed the shooter holding the gun in his right hand.

The prosecutor responded:

> Now, [defense counsel] wants to make a big deal. Well, [defendant] signed with his left hand and he's shooting with his right hand in that video . . . .  How could that be?  For any number of reasons.  I got a friend, for instance, and his son writes with his left hand and my friend was really, really excited about this, because that's going to make him a good athlete . . . . [N]o matter how hard he encourages his son to bat left and throw left and to be left-handed his son bats right and throws right, signs left.  Maybe . . . defendant had the gun in his right pocket and so he took out the gun with his right hand.  Maybe the most important thing for . . . defendant was not to be seen.  Maybe the most important thing was keeping that tee shirt on that face and so he use[d] his left hand to do that.  Does it matter which hand he happened to be holding the gun in?  Does that prove whether the shooter was left-handed or right-handed?  Doesn't prove anything, right?

Shortly after, the trial court instructed the jury in its final charge:

> Regardless of what counsel said or what I may have said in recalling the evidence in this case, it is your recollection of the evidence that should guide you as judges of the facts.  Arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence.  Although the attorneys may point out what they think is important in

---

[11]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-3822-22

this case, you must rely solely on your understanding and recollection of the evidence that was admitted during the trial.

The PCR judge concluded that defendant failed to show either <u>Strickland</u> prong. The judge noted the prosecutor's comment was in response to defense counsel's assertion that defendant "could not be the shooter because . . . the shooter fir[ed] with his [right] hand and [defendant] sign[ed] the <u>Miranda</u> card with his [left] hand," so it was "clearly within the scope of the evidence presented." Additionally, the judge found defendant did not show he was prejudiced by the "innocuous comment" since the trial judge "neutralized the potential . . . [of] the jury treat[ing] the comment as evidence" with his jury instruction.

We agree that, at a minimum, defendant failed to establish the prejudice prong of the <u>Strickland</u> test. Because "prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries," they are "afforded considerable leeway in closing arguments." <u>State v. McNeil-Thomas</u>, 238 N.J. 256, 275 (2019) (quoting <u>State v. Frost</u>, 158 N.J. 76, 82 (1999)). However, they "should not make inaccurate legal or factual assertions" and "must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." <u>State v. Smith</u>, 167 N.J. 158, 178 (2001). Still, "[a]

prosecutor may respond to defense claims, even if the response tends to undermine the defense case." State v. Nelson, 173 N.J. 417, 473 (2002).

Here, the prosecutor's comment about ambidexterity was in direct response to defense counsel's comment that defendant could not have been the murderer because the evidence showed that defendant was left-handed while the murderer was right-handed. Although the illustrative fact of the prosecutor's friend's son being ambidextrous was objectionable as beyond the scope of the evidence revealed during the trial, it was fleeting and did not affect the outcome of the trial given the trial court's jury instruction, which we "presume . . . the jury faithfully followed." Miller, 205 N.J. at 126. Thus, we are unconvinced that trial counsel's failure to object to the prosecutor's comment prejudiced defendant.

We also find no merit to defendant's claim that trial counsel was ineffective for failing to present sufficient evidence of his left-handedness. In addition to counsel pointing out that defendant signed the Miranda card with his left hand, counsel elicited Tobias's identification of defendant as the unknown man at Oakcrest Estates around 12:25 p.m. drinking by using his left hand. Defendant's claim is therefore belied by the record.

## VII.

Next, defendant alleges he received IAC because his trial counsel previously represented the murder victim and his brother, Anthony A. Jordan. Citing RPC 1.6(a), RPC 1.7(a)(2), and RPC 1.9(c), defendant asserts trial counsel's representation of him was materially limited by counsel's responsibilities to the brothers, as counsel did not investigate them or "witnesses close to them" and "might have been inclined to cross-examine [Jones, the victim's aunt,] less vigorously."

The issue of defense counsel's alleged representations of the victim and his brother was not raised at trial. Defendant raised the issue for the first time in his PCR petition. In his petition, defendant claimed trial counsel "never disclosed" the prior representations or conflict of interest but failed to provide any documentary evidence to support his claims.[12] Nevertheless, the PCR judge

---

[12] For the first time on appeal, defendant now submits records from the Person Case Search and Manage application (PCSAM) available on the New Jersey Courts website, seemingly asking us to take judicial notice of the prior representations. We generally restrict our review to evidence presented to the trial court. See R. 2:5-4(a) (stating "[t]he record on appeal shall consist of all papers on file in the [trial] court," inferring that it is improper to present evidence on appeal that was not before the trial court). Nonetheless, we have inherent authority to supplement a trial court record. Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 452 (2007) (citing R. 2:9-1(a)). In deciding whether to exercise this discretion, we consider whether the proponent

presumed trial counsel represented the victim and his brother, and addressed the claim on the merits.

In rejecting defendant's arguments, the PCR judge found defendant failed to show the first <u>Strickland</u> prong because (1) counsel's only responsibility to the victim at the time of defendant's trial was to adhere to RPC 1.9 and "[n]one of the responsibilities of [RPC] 1.9 [were] implicated here"; (2) the victim's death terminated "any former attorney-client relationship that existed"; and (3) there was no "actual conflict of interest present." As to the latter point, the judge added that counsel's representation of defendant was not materially limited by nor materially adverse to his past representation of the victim, "as this was not a case where [the victim] testified as a witness, nor . . . a civil case where [the victim] and [defendant were] adversaries."

---

of the information knew of the evidence at the time of the hearing and if it is likely to affect the case outcome. <u>Id.</u> at 452-53. Applying these factors, we decline to supplement the record with the PCSAM records. Defendant's allegations in his 2020 amended petition establish that he and his PCR counsel were aware of the alleged representations by the 2023 PCR hearing, and thus should have procured the records by that time. <u>See</u> <u>id.</u> at 453 (finding that the proponent of an expert report failed the first factor where it "could have sought" the report prior to filing a motion). Further, the records would not have affected the PCR outcome because they do not sufficiently establish that defense counsel previously represented the brothers.

Generally, for counsel to be "effective" under the New Jersey Constitution, they must provide clients "undivided loyalty, '"unimpaired" by conflicting interests.'" State v. Cottle, 194 N.J. 449, 466-67 (2008) (quoting State v. Norman, 151 N.J. 5, 23 (1997)). Nevertheless, "a great likelihood of prejudice must be shown . . . to establish [IAC]," id. at 467-68 (quoting Norman, 151 N.J. at 25), and the conflict "must be based on an actual conflict or potential conflict of interest" rather than just create an appearance of impropriety, State v. Hudson, 443 N.J. Super. 276, 289 (App. Div. 2015). Still, a violation of conflict rules does not automatically equate to IAC. See Norman, 151 N.J. at 28-30 & n.3 (finding that attorney who terminated representation of a defendant and then joined a partnership with an attorney who was representing a codefendant had violated the conflict rules but did not, by that action alone, render IAC).

"To avoid the prejudice inquiry under prong two of Strickland," a defendant must show that there is an "actual" conflict and "'the conflict adversely affected counsel's performance.'" State v. Kearney, 479 N.J. Super. 539, 556-57 (App. Div. 2024) (quoting Mickens v. Taylor, 535 U.S. 162, 170-71 (2002)). New Jersey's Constitution "provides broader protection against conflicts than does the [f]ederal [c]onstitution." Id. at 557 (quoting State v.

Drisco, 355 N.J. Super. 283, 292 (App Div. 2002)). Courts first determine "whether the alleged conflict is a 'per se conflict,'" and if so, "'prejudice is presumed in the absence of a valid waiver.'" Ibid. (quoting Cottle, 194 N.J. at 467). Even so, our Supreme Court has limited this per se rule to "cases in which 'a private attorney, or any lawyer associated with that attorney, is involved in simultaneous dual representations of codefendants.'" Cottle, 194 N.J. at 467 (quoting Norman, 151 N.J. at 24-25); see Kearney, 479 N.J. Super. at 558 (collecting cases).

Turning to the Rules of Professional Conduct upon which defendant relies to support his arguments, RPC 1.6(a) provides that "[a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except" for reasons that are not pertinent here. As attorney-client privilege survives a client's death, see Swidler & Berlin v. United States, 524 U.S. 399, 404-07 (1998), so too does RPC 1.6's duty of confidentiality, see State in the Int. of S.G., 175 N.J. 132, 140-41 (2003).

Related to the duty of confidentiality is the duty of loyalty. In pertinent part, RPC 1.9(a) provides that "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the

61

interests of the former client unless the former client gives informed consent confirmed in writing."

Matters are substantially related if:

> (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client, or (2) facts relevant to the prior representation are both relevant and material to the subsequent representation.
>
> [O Builders & Assocs., Inc. v. Yuna Corp. of N.J., 206 N.J. 109, 125 (2011) (quoting City of Atl. City v. Trupos, 201 N.J. 447, 451-52 (2010)).]

RPC 1.7 provides that, absent each client giving informed consent in writing,

> a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> > (1) the representation of one client will be directly adverse to another client; or
> >
> > (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

In determining whether representation is concurrent, our Supreme Court has stated that "[a]n attorney's responsibility[] as attorney of record in a criminal proceeding[] terminates upon expiration of the time in which to appeal from the final judgment or order." S.G., 175 N.J. at 141 (citing R. 1:11-3). Upon termination of the responsibility to the former client, the situation becomes "successive representation of clients," where, if the clients' interests are adverse, "the possibility of breach of client confidences becomes a focus of the conflict analysis." Ibid.

Although RPC 1.7(a)(2) commands attorneys to avoid concurrent conflicts between duties to current clients and responsibilities to "former client[s]," there is persuasive authority that this mandate is intended simply to incorporate the duties already existing under RPC 1.9:

> The 2004 amendments added responsibilities to former clients to the list of interests that may materially limit a lawyer's representation of a current client. This constitutes a significant change in the law, apparently blurring the distinction between RPC 1.7 and RPC 1.9. Neither the Pollock Commission nor the Supreme Court commented on this modification. The [American Bar Association (ABA)] comments, however, suggest that the addition was intended to incorporate an RPC 1.9 analysis. See ABA Model Rules of Pro. Conduct r. 1.7 cmt. 9 (2000) ("[A] lawyer's duties of loyalty and independence may be materially limited by responsibilities to former clients under Rule 1.9").

63

[Michels, New Jersey Attorney Ethics, § 19:3-1(a), at 453 (2021) (citations reformatted).]

Applying these principles, we agree with the PCR judge's rejection of defendant's arguments. Defendant's reliance on RPC 1.7 is misguided because defense counsel's representations of defendant, the victim, and the victim's brother were successive. The victim's case was disposed of on May 26, 2006, and the last time defense counsel represented the brother was May 13, 2009. Because the 2014 trial was well past the direct appeal time limitation of forty-five days for these cases, R. 2:4-1(a), trial counsel's responsibility to the brothers as their attorney of record was over. See S.G., 175 N.J. at 140-43. As the representations were not concurrent, counsel's representation of defendant was not a per se conflict. Cottle, 194 N.J. at 467.

Defendant's IAC claims under RPC 1.6 and 1.9 also fail as the record does not evince an "actual" or "potential conflict of interest." Hudson, 443 N.J. Super. at 289. Defendant's murder trial and the brothers' cases are not the "same" matter, as they do not involve the same parties or controversy. RPC 1.9. They are also not "substantially related" under the test announced in Trupos, 201 N.J. at 451-52. First, defendant admits he does not know "whether [defense] counsel had damaging confidential information he learned about the victim or his family." Second, given the age of the prior cases and their lack of connection

to defendant's case, it is unlikely that any facts from the prior representations were relevant or material.

Neither does the case law suggest that trial counsel's representation of defendant was materially adverse to his past representations of the brothers under RPC 1.9. The brothers were not witnesses in this case, see, e.g., United States v. Moscony, 927 F.2d 742, 747-48 (3d Cir. 1991) (affirming disqualification of firm from representing criminal defendant where attorney would have had to cross-examine former client), the victim was not defendant's adversary, and the victim's character was not in dispute since defendant pursued an alibi defense, see, e.g., Mickens, 535 U.S. at 178-79 (Kennedy, J., concurring) (noting that a defense counsel's unwillingness to attack the character of a victim—counsel's former client—in a murder trial could be a conflict where the victim's character was at issue, but that "a theoretical conflict does not establish a constitutional violation").

Moreover, defendant provides no evidence nor alleges specific facts to show how the supposed conflicts "adversely affected [his trial] counsel's performance." Kearney, 479 N.J. Super. at 557 (quoting Mickens, 535 U.S. at 170-71). His arguments that it was "possible" defense counsel may have "cross-examine[d]" Jones and the victim's "close associates" "less vigorously" or been

discouraged from "[i]nvestigati[ng] . . . the [brothers] and witnesses close to them" are vague allegations framed as possibilities. They are insufficient to meet the requisite standard. See R. 3:22-10(e)(2).

Lastly, defendant asserts trial counsel's failure to inform him or the trial court of the alleged conflict deprived him of his right to choose counsel and prevented the trial court from evaluating his counsel's fitness to serve. We first note that a defendant's right to choose counsel "is not absolute." State v. Kates, 426 N.J. Super. 32, 45 (App. Div. 2012), aff'd, 216 N.J. 393 (2014). Regardless, defendant's trial counsel had no duty to inform defendant or the court of the conflict of interest because there was none. See Mickens, 535 U.S. at 173-74 (failure of trial court to make inquiry into conflict of interest did not change finding that conflict did not adversely affect counsel's performance).

In sum, we are convinced there is no merit to defendant's IAC claims, either individually or cumulatively, and we discern no abuse of discretion in the PCR judge's rejection of the claims without an evidentiary hearing. See Marshall, 148 N.J. at 257 ("We reject the cumulative claims on the grounds that we rejected the individual claims.").

A-3822-22

VIII.

Defendant makes several arguments concerning the alleged jailhouse confession of Quaran Brown.  He asserts that the PCR judge erred in denying his motion for a new trial based on newly discovered evidence because Quaran Brown's "admi[ssion] he had shot Jordan" "sh[ook] the foundation of the State's case" against defendant.  Relatedly, he claims that the prior PCR judge erred in denying his discovery request for ACPO's files on Quaran Brown's criminal record and Sedrick Lindo's murder[13] on the basis of the alleged jailhouse confession.  Specifically, defendant alleges the discovery "could have enabled an additional claim regarding counsel's failure to adequately investigate Kevin Brown's claims" to "undercut his credibility as an eyewitness."

In his statement to police the day after the murder, Kevin Brown stated he believed defendant meant to shoot him instead of the victim because defendant and his associates were "scared at [him] reta[liating]" for the murder of his brother, Lindo.  Prior to trial, the defense filed a motion in limine to forbid the State from eliciting testimony regarding the Lindo murder, contending that such testimony would be used to prove defendant's criminal propensity.  The trial

---

[13]  Defendant alleged in his PCR petition that Lindo was Kevin Brown's brother who had been murdered in Atlantic City on July 29, 2012, and that Kevin Brown believed the murder had been committed by "[defendant] and his friends."

court granted the motion pursuant to N.J.R.E. 403, finding the proposed testimony had "zero probative value" and was "highly prejudicial" because it intimated defendant was "connected to a pack of murderers." In particular, the court stated it did not "know how [Kevin Brown] would have known" that defendant intended to kill him without defendant announcing his motive.

Following defendant's incarceration, he received two handwritten notes from fellow inmate Kevin Taylor, stating Taylor knew that two men nicknamed "Looch" and "Drizzy" committed the murder. Attorneys from the Public Defender's Office then video-conferenced with Taylor, who stated that "Looch was the shooter" and his real name was "Taquon . . . Brown." Taylor later gave a signed certification on February 14, 2019, in the presence of an investigator.

In the certification, Taylor stated:

> I have had conversations with and have been present for conversations involving[] an individual named Quaran Brown on various dates in 2014 and 2015. Brown admitted to me that he, and not [defendant], had been the shooter who killed the victim . . . .
>
> I knew Brown by a street name, Drizzy or Haze. Brown has told me that he and a guy named "Looch" were the ones involved in the shooting. I remember Brown being about [5'6"], brown[-]skinned and having small dreads.
>
> . . . I myself reached out for [defendant] via handwritten notes I passed to him telling him about the

68

information I had learned. I did so because it does not sit well with me that a man like [him] is in prison for a crime he did not commit.

In denying defendant's motion for a new trial based on the purported jailhouse confession, the PCR judge first acknowledged the strength of the State's case, noting it had presented "[three] eyewitness identifications by individuals who [were] familiar with [defendant] and identified him as the shooter." The judge then found Taylor's certification failed to satisfy prong one of the Carter test as it was "merely contradictory":

> The arguments [defendant] makes are speculative at best. Taylor does not identify who the shooter may have been, other than [defendant], with certainty. The contradictory aliases for Quaran Brown and lack of detail from the incident weighs against the credibility of . . . Taylor's [c]ertification. Further, the conclusory and speculative nature of [defendant's] arguments regarding Quaran Brown's motive to not shoot Kevin Brown are not persuasive as [defendant] has submitted no proofs to support such a connection. Also, Taylor never identified why Quaran Brown had the original intent to shoot James Jordan. . . . The arguments appear to be self-serving statements that merely serve to contradict the findings of the [trial] [c]ourt . . . .

We previously recited the legal principles governing the standard for granting a new trial based on newly discovered evidence. See Nash, 212 N.J. at 549 (quoting Carter, 85 N.J. at 314). While "[t]here can be no doubt that another person's confession is material and constitutes the sort of evidence that would

probably change the jury's mind," State v. Tormasi, 443 N.J. Super. 146, 151 (App. Div. 2015), such evidence when newly discovered "must be reviewed with a certain degree of circumspection to ensure that it is not the product of fabrication," Ways, 180 N.J. at 187-88.

Specifically, "post[-]conviction statements of persons who did not testify at trial, particularly when serving time at the same institution as defendant, are 'inherently suspect.'" State v. Allen, 398 N.J. Super. 247, 258 (App. Div. 2008) (quoting State v. Robinson, 253 N.J. Super. 346, 367 (App. Div. 1992)). We generally only credit exculpatory statements when they are sworn, based on personal knowledge, and credible from the totality of the circumstances. See, e.g., State v. Friedman, 4 N.J. Super. 187, 189-91 (App. Div. 1949) (granting motion for new trial based on sworn, post-trial confession where confessor had extensive criminal record, defendant had no criminal record for about twenty-five years prior to being indicted, and confessor had been suspected of committing crime by State); Allen, 398 N.J. Super. at 250-52, 258-59 (remanding for evidentiary hearing where witness who did not testify at trial prepared affidavit and gave interview to defense investigator identifying another person as the murderer).

70

Applying these principles, we are satisfied the purported jailhouse confession fails to satisfy prong three of the Carter test because of its patent unreliability. See Allen, 398 N.J. Super. at 258. We first point out that the second-hand confession is hearsay because Taylor's certification refers to Quaran Brown's statements to him. Defendant has provided no affidavit or certification from Quaran Brown based on Brown's personal knowledge nor has defendant located Brown. See generally State v. Nevius, 426 N.J. Super. 379, 394-95 (App. Div. 2012) (noting it is within a trial court's discretion to find that exculpatory hearsay statements against interest are still "too unreliable and untrustworthy" to be admissible).

Additionally, Taylor's identification of Quaran Brown as the shooter is dubious at best. Taylor originally identified "Looch" as the shooter and stated his name was "Taquon . . . Brown." He then changed his story in his certification, identifying Quaran Brown as "Drizzy" or "Haze" and stating that "Looch" was instead an accomplice of Quaran Brown's. There is nothing in the record by which to corroborate the physical description Taylor gave of Quaran Brown,[14] and defendant's proof that Taylor and Quaran Brown were in the same

_____

[14] Defendant claims that Taylor was shown a photograph of Quaran Brown and confirmed that he was the inmate who confessed, but there is no proof of this in the record. The PCR judge noted as such in her opinion.

prison for approximately two months is inadequate to sufficiently establish the purported confessor's identity.

Even assuming Quaran Brown confessed to Taylor, defendant has failed to show sufficient indicia of reliability demonstrating the confession was not fabricated. Ways, 180 N.J. at 187-88. Taylor's certification does not provide Quaran Brown's motive to kill the victim and is barren of details as to what Quaran Brown specifically told him or how he committed the crime. In his PCR petition, defendant suggested that Quaran Brown was the shooter because of his "violent spree in Atlantic City" in 2013 and 2014, and also that Quaran Brown would not have wanted to shoot Kevin Brown because the two were allies. However, these claims are entirely speculative. Because the evidence is not the type that would change the jury's verdict, the motion for a new trial was properly denied.

Similarly, defendant failed to demonstrate good cause for his discovery requests related to Quaran Brown and Lindo because he did not "allege facts that if proved, would entitle[] him . . . to relief." Szemple, 247 N.J. at 108 (quoting Turner, 976 So.2d at 511). Defendant's motion to compel amounted to a fishing expedition for material establishing Quaran Brown's criminal ties to Kevin Brown. Such information would not have rendered Taylor's certification

credible or established Quaran Brown's motive to kill Jordan. Thus, his newly discovered evidence claim would have failed regardless.

We are equally unpersuaded that the discovery would have aided defendant in pursuing an additional IAC claim against his trial counsel for failure to investigate Kevin Brown. Defendant has not provided a certification or affidavit specifying what further investigation would have revealed. See Porter, 216 N.J. at 353. Regardless, trial counsel could not have cross-examined Kevin Brown on the murder of Lindo anyway because of the trial court's ruling on the motion in limine. We do not question counsel's strategic decision to protect defendant from being prejudiced by association with Lindo's murder. See Cooper, 410 N.J. Super. at 57.

Therefore, we affirm the portion of the December 21, 2021 order denying defendant's motion to compel discovery and the portion of the June 29, 2023 order denying defendant's PCR petition based on newly discovered evidence.

IX.

Finally, we turn to defendant's claim that the PCR judge abused her discretion by denying his request for an adjournment of the PCR hearing. According to defendant, his PCR counsel informed the judge she was still "in [the] midst of investigating the case," and that "several outstanding issues"

73

remained, "including regarding video and whether it could be enhanced, and questions about which witnesses had been and should be interviewed."

We "review a trial court's denial of a request for an adjournment 'under an abuse of discretion standard.'" Escobar-Barrera v. Kissin, 464 N.J. Super. 224, 233 (App. Div. 2020) (quoting State by Comm'r of Transp. v. Shalom Money St., LLC, 432 N.J. Super. 1, 7 (App. Div. 2013)). "Whether there was an abuse of discretion depends on the amount of prejudice suffered by the aggrieved party." Ibid. "Thus, refusal to grant an adjournment will not lead to reversal 'unless an injustice has been done.'" Ibid. (quoting Nadel v. Bergamo, 160 N.J. Super. 213, 218 (App. Div. 1978)).

At the June 28, 2023 PCR hearing, the judge asked defendant's PCR counsel what she still needed to investigate. Counsel provided no specific examples, other than "trying to locate" Carol Johnson, and cited attorney-client privilege. In denying the request for an adjournment, the judge provided a litany of reasons why the hearing should go forward, focusing on the case's unusual and protracted procedural history:

> This petition for [PCR] has been pending since June 26, 2018. Briefs were filed by these parties in 2020. On March 11[], 2021[,] [the first PCR judge] heard full arguments on those petitions and stated at the end of the hearing after . . . reviewing the briefs and hearing full

74

arguments, I'm going to have counsel back in a month and give you my decision.

And for whatever reason he didn't have counsel back in a month. . . . [I]n April of 2021 this matter should have been decided.

. . . .

. . . [F]all of 2022 is when [defendant's second PCR counsel] entered into this matter and it was eventually assigned to me[ as a] backlog PCR, . . . as this was [probably] the oldest . . . [pending] PCR [petition] . . . .

. . . .

. . . The State has a strong interest in achieving finality. Without procedural rules requiring the consolidation of issues, litigation would continue indefinitely in a disconnected and piecemeal fashion. . . . [J]udicial resources can be more efficiently used to decide cases in a timely fashion[, particularly when] . . . relevant issues in a case are . . . interrelated.

We discern no abuse of discretion in denying the adjournment request and affirm substantially for the compelling reasons articulated by the PCR judge. Defendant failed to provide adequate justifications for the adjournment request. Defendant's PCR counsel received the case file at least six months prior to the PCR hearing and had already been granted a one-week continuance. Furthermore, defendant's citations to Rule 3:22-6(d) and case law for the proposition that his counsel was unprepared to argue the merits are unavailing,

as these authorities merely require PCR counsel to "advance all of the legitimate arguments requested by the defendant that the record will support." Ibid.; see also State v. Webster, 187 N.J. 254, 257 (2006) (stating a PCR counsel's brief must incorporate all "legitimate" "arguments that can be made" from a defendant's petition); State v. Velez, 329 N.J. Super. 128, 134 (App. Div. 2000) (finding "it was not enough" for PCR counsel to "blandly recite [the] defendant's poorly articulated and inadequately presented arguments" with "passing familiarity"). Here, PCR counsel demonstrated her familiarity with the facts and made extensive, vigorous arguments on the claims in defendant's petition. Moreover, the merits had already been fully vetted and argued in March 2021.

To the extent we have not specifically addressed any of defendant's remaining arguments, we deem them without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division